IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS HOLMAN | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| TRAMMELL CROW CO. | : | NO. 03-3603 |

ORDER AND OPINION

JACOB P. HART  
UNITED STATES MAGISTRATE JUDGE
DATE:   February 3, 2005

I.     Introduction

Plaintiff Thomas Holman brought this action against his former employer, Trammell Crow Co. ("TCC"). He has asserted counts under 42 U.S.C. § 2000 *et seq*. ("Title VII") for race discrimination, and retaliation for complaints of race discrimination. He has also asserted counts for racial discrimination under 42 U.S.C. § 1981.

TCC has moved for summary judgment on Holman's entire case. For the reasons that follow, its motion will be granted in part and denied in part. I will dismiss (a) those claims based on Holman's termination; and (b) Holman's Title VII claim for hostile work environment.

II.     Factual Background

Between 1996 and September 30, 2002, TCC provided real estate management and facilities services to University City Associates ("UCA"), which owned apartment complexes near the University of Pennsylvania. Declaration of John Greenwood, attached to TCC's Motion; Letter attached as Exhibit 26 to Declaration of Leah Lively, attached to TCC's Motion. At the time it was retained by UCA, TCC hired many of UCA's workers, including Holman, who had worked for UCA as a painter. Holman Deposition Excerpt, attached as Exhibit 14 to Lively Declaration, at page 23. In his offer letter from TCC, Holman's employment was made contingent upon its management contract with UCA. Exhibit 6 to Lively Declaration.

Holmes' title with TCC was "Maintenance Assistant." Id. at 28. His first supervisor was Jim Quindlen, who was replaced in the summer of 2000 by John Economos. Statement of Louise Heick at ¶¶ 4 and 5. Under these Property Managers, Holman received stellar performance reviews, complementing his speed, efficiency, and manner of relating to residents. Exhibits 9 and 11 to Lively Declaration, attached to TCC's Motion. Quindlen referred to Holman as his "MVP." Exhibit 9, supra.

Although Holman's job title did not change, Economos complimented him in his November, 1999, review on several projects he had undertaken on his own initiative. Exhibit 11, supra, at D00024 and Exhibit 12 at D00021. Economos also wrote that he would work with Holman to develop a floor finishing project Holman proposed, and commented that "this will give Tom an opportunity to learn more of the business side of decisions." Exhibit 11 at D00024 and 12 at D00021. In a section of the form which asked: "What added training or experience would improve the employee's performance in the present job and/or prepare the employee for advancement?" Economos wrote: "Taking courses in management skills and motivating people, combined with his experience will help him to achieve further career growth." Exhibit 12 at D00023.

According to Holman, Economos also gave him increasing responsibility in dealing with sub-contractors, eventually permitting him to receive bids and award contracts. Holman Deposition Excerpt, supra, at 80, 85-88.

According to TCC, however, Economos's sector, known as Zone 2, was poorly managed. Heick Declaration, supra, at ¶ 5. In May, 2000, Mark Brady replaced Economos as the Zone 2 supervisor. Id. at ¶¶ 6-7; Holman Deposition Excerpt, supra, at 93.

Shortly after Brady and Holman began working together, they disagreed on a contracting matter. Holman was about to award contracts to two subcontractors: The Cors Company, which was owned by African-Americans, and Rusario, a white-owned business. Brady Declaration, attached to TCC's motion, at ¶ 9. At this meeting, Brady said that he "didn't like" Cors. Holman Deposition Excerpt, supra, at 99. According to Brady, he explained to Holman that this was because Cors's work in the past had been slow. Brady Declaration, supra. Nevertheless, both bids were forwarded to Brady's superiors and approved. Id.

According to Holman, as work progressed on the job for which Cors and Rusario were hired, Brady told Holman that he did not want Cors working inside the buildings, but only on the exteriors. Holman Deposition Excerpt at 102. On one occasion, having found Cors employees working inside a building, Brady allegedly screamed at Holmes: "What did I tell you? I don't want your kind of people in the buildings." Holman Deposition at 111-112. Holman has stated: "At that point, I called him a racist." Id.

According to Brady, he reported Holman's accusation of racism to TCC's Alliance Director, John Greenwood. Brady Declaration at ¶ 10. There followed three meetings in the space of ten days between Holman and various TCC higher-ups, including Louise Heick, Jim Quindlen, Jennifer Mathewson, DeeAnn Kelly, and John Greenwood. Holman Deposition at 115, 123, 187.

Holman claims that he told Heick and Quindlen that Brady was interfering with his responsibility for hiring subcontractors, but that he was told that hiring decisions were Brady's, and it was pointed out that Holman himself had terminated Cors in the past because it was not going to meet a deadline. Holman Deposition at 117-118.

Holman claims, however, that Greenwood, and Kelly (who was TCC's Senior Manager of Human Resources), "confirmed that awarding contracts was part of [his] responsibilities." Holman Affidavit attached as Exhibit D to Holman's Response at ¶ 10. Holman also asserts that he told Greenwood and Kelly that he considered Brady to be racist, and that his co-worker, Tommy Brennan, told Kelly that he agreed with this. Id. at ¶ ¶ 10 and 11.

In August, 2000, Brady reassigned Brennan and Kyle Meyers, who had previously worked as painters under Holman, to general maintenance. Brady Declaration at ¶ 12, and Exhibit 2 to Brady Declaration. Holman was the only remaining painter. Exhibit 2 to Brady Declaration.

In September, 2000, Quindlen assigned Holman the job of single-handedly painting three fire towers. Quindlen Declaration at ¶ 5. Holman claims that he asked Quindlen for assistance, but that Quindlen refused. Holman Affidavit at ¶ 15. According to Holman, Fire Tower One was unheated, with broken windows, and pigeon droppings coating the floor. Id. at ¶ 16. Holman complained about this to the project manager, but was not given any assistance. Id. at ¶ 17. Although he has not submitted records to substantiate this, Holman claims that he was taken to the hospital on "several occasions" because he had become sick to his stomach from these conditions. Id.

Holman maintains that Tower Number Two contained lead and asbestos, and that he was not issued a mask. Id. Although this too is unsubstantiated by medical records, Holman has asserted that he was taken to the hospital after several days with lead exposure. Id.

On December 11, 2000, while he was painting Fire Tower One, Holman fell from his ladder. Holman Deposition at 254. Since he was alone, Holman called for help from his cell phone. Memorandum at 5. He lay in the tower waiting for help for approximately 20 minutes or half an hour. Holman Deposition at 260. As a result of the injury, Holman claims, he incurred a sprained left ankle, foot tarsal tunnel syndrome, and a herniated disc. Holman Affidavit at ¶ 22.

After his accident, Holman remained at home on Workers' Compensation. Holman Affidavit at 260. In September, 2002, UCA terminated its contract with TCC. Exhibit 24 to Lively Declaration. Holman was discharged, along with all other TCC employees working at UCA. Id. TCC has provided evidence that, of the 56 employees discharged, 20 were white. Charlene Trace Declaration at ¶ 9, and Exhibit 1 thereto. Holman was offered employment by the new maintenance contractor, but did not accept it. Exhibit 25. There is a disputed issue of fact as to whether Holman was physically capable of work at this time.

III.     Legal Standard For Summary Judgment

Summary judgment is warranted where the pleadings and discovery, as well as any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pr. 56. The moving party has the burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp.. v. Catrett, 477 U.S. 317, 323 (1986). In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, supra at 325; Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn from it in favor of the non-moving party. Anderson v. Liberty Lobby, supra at 255; Tiggs Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). Nevertheless, Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra, at 323.

III.  Discussion

A.  Claims Regarding Holman's Termination Will Be Dismissed

Holman has not shown that a question of material fact exists as to whether his termination was discriminatory or retaliatory. As discussed above, TCC has provided evidence that Holman formerly worked directly for UCA, and that his retention by TCC was contingent upon TCC's management contract with UCA. It has also shown that Holman's employment was terminated only when TCC lost this contract. Most important, Holman was terminated along with every other TCC employee working at UCA, regardless of race or relationship with management. And, like the other terminated employees, Holman was offered employment by the new maintenance contractor.

Under both § 1981 and Title VII, a *prima facie* case of disparate treatment requires a plaintiff to demonstrate that (1) he is a member of a protected class; (2) he was qualified for the relevant position; (3) he suffered an adverse employment action; and (4) nonmembers of the protected class were treated more favorably. Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 522 (3d Cir. 1992).

Since Holman cannot show the fourth factor – i.e., that other, white, TCC employees were treated more favorably than he, he will not be able to make out a *prima facie* case of racial discrimination.  See, e.g., Tucker v. Merck & Co., Inc., Civ. A. No. 03-5015, 2004 WL 1368823 (E.D. Pa. Jun. 17, 2004).

To establish a *prima facie* case of retaliation with respect to his termination, Holman would have to show a causal connection between his protected activity and the termination. Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001).  Here, again, the fact that every TCC employee working at UCA was terminated would preclude a jury from finding the required connection.

Holman argues that he was not in a position to take advantage of the new offer of employment, because of his medical condition.  He argues that his termination at such a time shows retaliation by TCC for his having filed for workers' compensation.  However, there is no such claim in Holman's Complaint, nor has Holman come forth with any evidence of discrimination on this basis.  In any event, I would repeat that, since all employees working on this project were dismissed, there was no apparent discrimination.  I will dismiss Holman's claims of racial discrimination and retaliation for complaining of racial discrimination in so far as they relation to his termination from employment.

TCC has also asked for the dismissal of any claim that Holman was unfairly denied promotions.  I will dismiss such claims since there is no evidence that Holman ever applied for a new position.  However, as discussed below, Holman's allegations that he was subjected to discriminatory and retaliatory changes in his employment status will not be dismissed.

7

B.    Holman's Claims of Hostile Work Environment Are Dismissed as Unexhausted

It is well-established that to bring suit under Title VII a plaintiff must first file a timely administrative charge with the EEOC or a similar state agency.  42 US.C. § 2000e-5(e); Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997); Visnikar v. Department of Environmental Protection, Civ. A. No. 02-963, 2004 WL 438688 at *5 (W.D. Pa. Jan. 27, 2004). As Judge Francis X. Caiazza explained in Visnikar:

> To determine what claims are properly before the District Court, the test developed by the Third Circuit Court is whether the claims at issue fall "fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." See Antol [v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996)] (citation omitted).  The Third Circuit Court has cautioned against reading a plaintiff's EEOC charge too narrowly, stating that courts must "keep in mind that charges are drafted by one who is not well versed in the art of legal description."  See Hicks v. ABT Association, Inc., 572 F.2d 960, 965 (3d Cir. 1978).  Thus, "the scope of the original charge should be liberally construed."  See id. (citation omitted).

2004 WL at *5.  This standard applies to PHRA claims as well.  Id.

In his PHRA claim, Holman asserted only that TCC "discriminated against him by demoting him to a lesser position and title, all because of his race and/or color and/or retaliation." PCHR Statement of Particulars, attached as Exhibit 1 to Declaration of Leah Lively, attached to TCC's motion, at ¶ 10.  He mentioned Brady's alleged racist statements only in the context of Brady's interference with what Holman believed to be his job duties: "Brady commented that he was concerned about the Blacks and Minority Contractors' ability to do the work.  He also said 'I do not want them working in the mainstream buildings.  I want them to work outside the main campus of the University of Pennsylvania.'" Id. at ¶ 7.

Even construing this charge liberally, it is clear that it does not allege the existence of a hostile work environment, which exists only when a workplace is permeated with discriminatory intimidation, ridicule and insult so severe or pervasive as to alter the terms and conditions of the victim's employment and create an abusive working environment. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); Nerosa v. Storecast Merchandising Corporation, Civ. A. No. 02-440, 2002 WL 1998181 at * 4 (E.D. Pa. Aug. 28, 2002).

In Nerosa, supra, the Honorable Jay C. Waldman dismissed as unexhausted a hostile work environment claim where a plaintiff had indicated in her administrative charge only discrimination based on her termination. He cited Cheek v. Western & Southern Life Insurance Co., 31 F.3d 497, 503 (7th Cir. 1994), where the Court of Appeals for the Seventh Circuit wrote: "ordinarily a claim of sexual harassment cannot be reasonably inferred from allegations in an EEOC charge of sexual discrimination." In other cases, hostile work environment charges have been dismissed where an administrative complaint asserted only failure to promote. Visnikar, supra at *6; Lawton v. Sunoco, Inc., Civ. A No. 01-2784, 2002 WL 1585582 at *4 (E.D. Pa. Jul. 17, 2002); Wright v. Philadelphia Gas Works, Civ. A. No. 01-2655, 2001 WL 1169108 (E.D. Pa. Oct. 2, 2001).

Holman points to Jenkins v. Blue Cross Mutual Hospital Insurance, Inc., 538 F.2d 164 (7th Cir. 1976), where the Court of Appeals for the Seventh Circuit permitted a plaintiff to claim sex discrimination even though her administrative charge asserted only race discrimination, because she had asserted in her charge that her supervisor had accused her of being "a leader of the girls on the floor." Even if Jenkins could be seen as establishing a more liberal construction of an administrative charge than the cases upon which I have relied, I note that it is a thirty-year-

old case which has been cited only once in this Circuit, and not for this proposition. See Hicks v. ABT Associates, Inc., 572 F.2d 960, 966 (3d Cir. 1978). Jenkins notwithstanding, therefore, I will dismiss Holman's claim of a hostile work environment.

C.   Holman's Remaining Claims

Remaining in this case are Holman's claims under Title VII and § 1981 that (a) he was discriminated against in his work conditions on the basis of racial discrimination; and that (b) he was retaliated against in his work conditions for having complained about racial discrimination. As to these claims, TCC has argued that Holman cannot show an adverse action and cannot overcome TCC's asserted legitimate reasons for the actions it did take, as required by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

I remind TCC, however, that the Third Circuit has held that an action which does not involve a change in salary or benefits can be considered an adverse action if it "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Robinson v. City of Philadelphia, 120 F.3d 1286, 1299 (3d Cir. 1997); and see Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 787 (3d Cir. 1998) (transfer to an undesirable shift, eliminating the plaintiff's customary free time, was sufficient to establish a *prima facie* case) and Torre v. Casio, Inc., 42 F.3d 825, 829 (3d Cir. 1994) (transfer to a "dead-end" job could be actionable).

Holman has asserted that the terms of his employment were altered to take away his subordinates and to remove his authority for entering into subcontracts, ending his involvement in, as Economos put it, the "business side" of maintenance. He has also claimed that he was placed in dangerous and unfavorable physical surroundings with no assistance. These actions by

TCC may be found adverse, under the authority cited above. Although TCC has come forward with non-discriminatory reasons for its actions, the jury may choose to believe Holman's version of the facts. Therefore, TCC is not entitled to judgment as a matter of law on these claims.

IV.   Conclusion

For the reasons discussed above, I now enter the following:

O R D E R

AND NOW, this   3rd   day of February, 2005, upon consideration of Defendant Trammell Crow's Motion for Summary Judgment, docketed in this case as Document No. 36, and the response thereto, it is hereby ORDERED that the Motion is GRANTED IN PART and DENIED IN PART as follows:

1.   The Motion is GRANTED in that the following claims are dismissed with prejudice:

   a. All claims relating to Holman's termination as an employee of Trammell Crow;

   b. All claims that Holman was denied promotions;

   c. Holman's Title VII hostile work environment claim

2.   The Motion is otherwise DENIED.

BY THE COURT:

_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE